IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| DeCARLOS GARRETT | § | |
| | § | CIVIL ACTION NO. 9:06cv246 |
| UTMB, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

    The Plaintiff DeCarlos Garrett, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c). As Defendants, Garrett sued the University of Texas Medical Branch, Nurse K. Smith, Nurse L. Curry, Dr. Porras, Nurse Hanson, Medical Director A. Zond, and Warden Hirsch.

    An evidentiary hearing was conducted on April 5, 2007, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his complaint, Garrett says that on June 26, 2006, he developed "a very intense pain" in his stomach. Security officers called the infirmary, but Nurse K. Smith refused to see him. The officers finally took Garrett to the infirmary anyway because he was throwing up, and Smith had him sit in a waiting area for an hour. She did not examine him or take his vital signs, and when he did not throw up again, she had him returned to his housing area.

    By June 28, Garrett says, the pain had increased so much that he was trying to tell the desk officer about it when he collapsed. Nurse Curry came and took him to the infirmary in a wheelchair. His urine was orange or reddish in color, and so Curry determined that he had a urinary tract infection. Dr. Porras looked into the examining room and Curry told him her conclusion, and he agreed, without examining Garrett himself. Medications for a urinary tract infection were prescribed for him.

A few days later, Garrett says, he saw a nurse practitioner named Hansen. She discontinued his medications and gave him a shot, but this shot was so strong it made him vomit and increased his heart rate. Dr. Porras gave Garrett medications for the side effects and told him that he would be in charge of Garrett's care, but Garrett saw Hansen again on July 10. She discontinued his treatments at that time.

Garrett stated that he saw Nurse Curry on July 13, 2006, and she again focused on the color of his urine. However, another nurse practitioner, Overbeck, ordered a stomach X-ray. Garrett stated that when the results of this came back, he was taken to the hospital, where he had emergency appendix surgery.

Garrett explained that he sued Zond because he sent an inmate request form to Zond and was told that his complaint would be investigated, but it never was. He stated that he sued Hirsch because Hirsch, as warden, was in charge of the unit.

Warden Pratt, a TDCJ warden present at the Spears hearing, testified under oath that if an inmate becomes ill, guards will call the medical department for assistance. Normally, he said, if a guard sees an inmate throwing up or with a visible injury, the officer will take the inmate to the medical department.

Nurse Thomas Maciel, R.N., testified at the Spears hearing concerning the contents of Garrett's medical records. The Court has also received and reviewed a copy of these records. These medical records generally confirm Garrett's testimony. The first mention of the incident in the medical records is on June 28, 2006. At this time, Garrett was seen by Nurse Curry with a complaint that his stomach hurt so much that he could not walk. He had tenderness in the suprapubic area (i.e. the lower middle of the stomach) and his urine was observed to be "dark yellow orange" in color. Dr. Porras was notified and medications were ordered, including an antibiotic called Bactrim and a pain medication called Motrin 800. A urinalysis and CBC (complete blood count) were also ordered, and Garrett was given a cell pass for seven days and told to return to the clinic on June 30.

On June 30, Garrett saw Nurse Janice Hanson, a nurse practitioner. She noted that Garrett had been diagnosed with a urinary tract infection and that Garrett reported that he could not take the Bactrim without throwing up. She discontinued the Bactrim and gave him an intra-muscular injection of an antibiotic called Ancef, as well as an anti-nausea medication called Phenergan. Hanson asked that an appointment be scheduled with the doctor for the following Monday, July 3.

On July 3, Garrett saw Dr. Porras, who noted that a urinary tract infection had been diagnosed and that Garrett had complaints of nausea and vomiting; Garrett had not tolerated Bactrim and so it was switched to Ancef. Dr. Porras observed that Garrett had lost 12 pounds since June 28 and that he was also suffering from sinus tachycardia (accelerated heart rate). He gave Garrett a medication called propranolol for his heart rate and ordered a soft bland diet for five days, as well as a medical pass for five days. He directed that Garrett return to the clinic for a follow-up on July 6, 2006.

The next entry in the medical records is dated July 7, 2006. At this time, Garrett saw Hanson, and told her that he felt much better. He had no nausea, no abdominal pain, no burning, and no pain upon urination.

However, this did not last. A week later, on July 14, at 7:46 a.m., Garrett came to the clinic with a pass to see Overbeck. He initially saw Hanson, and told her that he would rather see Overbeck. He returned at 3:35 p.m. and told Overbeck that he was again having abdominal pain and that yesterday was "the first he'd eaten in a while." A urinalysis was done and Overbeck ordered an abdominal X-ray and gave him a pain medication called ibuprofen and an antibiotic called Flagyl; she also ordered that lab work be done, the results of which came back on July 18.

When Garrett's symptoms continued, he was taken to Memorial Medical Center in Livingston and admitted on July 19. A CT scan showed inflammatory changes in multiple loops of bowel and a possible inflamed appendix, and an appendectomy was performed that same day.

Legal Standards and Analysis

Garrett's complaint is that the Defendants were deliberately indifferent to his serious medical needs. He asserts that on June 26, 2006, Nurse Smith at first refused to see him, and then did not

examine him. Garrett contends that Curry mis-diagnosed him as having a urinary tract infection, that Porras did not adequately examined him and simply accepted Curry's diagnosis, that Hanson discontinued his medications and gave him a shot which dangerously raised his heart rate, that Zond failed to investigate his allegations, and that Hirsch did not investigate his grievances and is the "supervisor of the infirmary," and so is responsible for what went on.

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In <u>Domino v. TDCJ-ID</u>, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. <u>Johnson v. Treen</u>, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." <u>Id.</u> Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." <u>Estelle v. Gamble</u>, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. <u>Farmer v. Brennan</u>, 511 U.S. 825, 838 (1994).

<u>Domino</u>, 239 F.3d at 756; *see also* <u>Stewart v. Murphy</u>, 174 F.3d 530, 534 (5th Cir. 1999).

In <u>Stewart</u>, the plaintiff Eugene Stewart was incarcerated in May of 1993, at which time he was 67 years old and suffering from numerous ailments, including hypertension, arthritis, gout, and heart disease. In August of 1994, he was admitted to the hospital for treatment of swollen legs, a possible indication of congestive heart failure. He was treated for five days and then released, but the next day, the treating physician, Dr. Dial, was notified that Stewart had a large decubitus ulcer (i.e. a bedsore) on his back. He ordered cleansing of the ulcer, treatment with antibiotics, and placement on the sick call list; however, it was not clear why such a wound was not discovered during Stewart's stay in the hospital, rather than after his discharge.

Stewart was readmitted to the prison hospital on September 6, 1994, this time under the care of Dr. Kim. She took cultures from the ulcer, debrided the wounds, and administered antibiotics and IV fluids. Dr. Kim also ordered that the dressings be changed three times a day and that Stewart be repositioned every three hours, but acknowledged that due to staffing problems, the nurses sometimes did not carry out the doctor's orders.

Stewart's ulcers did not improved and he was transferred to a non-prison hospital for consultation and treatment. When he returned, Dr. Kim did not follow the free-world physician's

5

advice to transfer Stewart to another facility for physical therapy.  Instead, Dr. Kim ordered that Stewart be kept out of bed as much as possible and that the nurses move his extremities.  She also transferred him to the care of another physician, Dr. Knutson.

Dr. Knutson treated Stewart's ulcers with medication, ordered that the dressings be changed twice a day, and that Stewart be repositioned every hour.  He also checked the wounds periodically and ordered that Stewart get out of bed for extended periods of time.

However, Dr. Knutson conceded that he often did not read the nurses' notes, which said that Stewart had an infection from a catheter, and did not prescribe antibiotics.  He did not see Stewart over the Thanksgiving four-day weekend, and saw him next on November 28, 1994, at which time Stewart appeared like he was going to die.  Dr. Knutson tried to treat Stewart at the prison hospital but ultimately transferred him to the University of Mississippi Medical Center, where the attending physician stated that Stewart had "the worst bedsores she had ever seen."  Stewart died on December 7, 1994.

Stewart's family sued Drs. Dial, Kim, Knutson, and Russell, the medical director at the prison facility.  The district court granted summary judgment for the physicians, and an appeal was taken.

On appeal, the Fifth Circuit affirmed the grant of summary judgment.  The Fifth Circuit concluded that there was no probative evidence that any of the doctors denied, substantially delayed, or intentionally interfered with treatment.

In the present case, Garrett's primary complaint is that the appendicitis from which he actually suffered was mis-diagnosed as a urinary tract infection.  There is no question that appendicitis is a serious medical need.  As noted above, however, "negligent or mistaken" medical treatment does not by itself rise to the level of a constitutional violation.  Graves, 1 F.3d at 319-20. Garrett has not shown that Curry, Hanson, or Dr. Porras acted with deliberate indifference towards him; on the contrary, the medical records show that they consistently acted to treat the ailment from

which they thought that he suffered. The fact that this belief was mistaken does not show that they were deliberately indifferent towards him.[1]

Garrett also complains that Hanson discontinued his treatment and gave him a shot to which he had an adverse reaction, in that it elevated his heart. The medical records show that Garrett complained that the oral antibiotic was making him throw up, and so Hanson gave him an intra-muscular antibiotic by injection. His medical records show that he had no known drug allergies, and it is not clear whether Garrett's sinus tachycardia was caused by the antibiotic or by the impending appendicitis attack. In any event, it is clear that Garrett has not shown that Hanson acted with deliberate indifference in discontinuing an oral antibiotic which was being vomited, and giving Garrett an injection of antibiotic which he could not throw up.

Garrett also complains that Hanson discontinued his treatment. However, the medical records show that at one point, Garrett told Hanson that he was feeling much better and no longer had symptoms. Nurse Maciel explained at the Spears hearing that this is not unusual in cases of appendicitis, because the rupturing of the appendix causes the patient to feel a brief period of relief before the discomfort returns. As noted above, however, appendicitis is difficult to diagnose, and so Hanson simply wrote in the clinic notes that the condition "was not found." The fact that she did not conclude that Garrett was suffering from appendicitis because his symptoms had receded is plainly not proof of deliberate indifference, nor is the fact that she discontinued treatment because it appeared no longer necessary.

Garrett complains that Nurse Smith would not have security bring him to the infirmary, and then, when he was brought anyway, she had him placed in a waiting area, and then returned to his housing area when he did not throw up. Whether or not these actions amounted to negligence, however, they were not deliberately indifferent within the parameters of that term as defined by Fifth

---

[1] Appendicitis can be difficult to diagnose because the symptoms mimic those of other ailments, and because the position of the appendix in the abdomen can vary. *See, e.g.*, http://www.medicinenet.com/appendicitis/page3.htm; http://www.mayoclinic.com/health/appendicitis/DS00274/DSECTION=4.

Circuit precedent. Instead, Nurse Smith's actions appear more akin to that of the physician in <u>Domino</u>, who gave a patient expressing suicidal ideations a perfunctory five-minute examination before returning him to his cell.

The Fifth Circuit has observed that the deliberate-indifference standard requires a showing that the official was subjectively aware of the risk of serious harm; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must draw that inference. <u>Easter v. Powell</u>, 467 F.3d 459, 463 (5th Cir. 2006). In this case, prison officials called to tell Smith that Garrett was ill, but she declined to see him; when he came to the infirmary with a complaint of throwing up, she placed him in a holding area, and when vomiting did not manifest, she had him returned to his housing area. This is a classic example of a prison official who failed to alleviate a significant risk that she should have perceived but did not; as the Supreme Court said, this is "no cause for commendation," but does not rise to the level of deliberate indifference so as to amount to a constitutional violation. Garrett's claim against Smith is without merit.

Garrett's complaint against Dr. Zond is based on his assertion that he complained about the lack of treatment, but nothing was done. He indicated at the hearing that he sent Dr. Zond an I-60 inmate request form on June 27, the day before he was seen by Curry.

The Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so. <u>Geiger v. Jowers</u>, 404 F.3d 371, 373-74 (5th Cir. 2005). Thus, the fact that Dr. Zond did not respond to his request as Garrett may wished does not set out a constitutional violation. Furthermore, Garrett was seen by Curry the next day, and so even had Dr. Zond investigated, he would have discovered that Garrett was being seen and treated by medical staff. Garrett has failed to show any constitutional violation and so his claim against Dr. Zond is without merit.

Similarly, Garrett's complaint that Warden Hirsch did not properly respond to or investigate his grievances lacks merit because he does not have a constitutional entitlement to an investigation which he deems adequate. His contention that Warden Hirsch is the "supervisor" over the infirmary is not accurate, in that TDCJ wardens do not supervise medical personnel; even were it correct, though, this would be a claim of liability under the doctrine of supervisory liability or *respondeat superior*. The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases. Williams v. Luna, 909 F.2d 121 (5th Cir. 1990). A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).

In this case, Garrett has not shown that Hirsch was personally involved in a constitutional deprivation, that wrongful conduct by Hirsch was causally connected to a constitutional deprivation, or that Hirsch implemented a constitutionally deficient policy which was the moving force behind such a deprivation. His claim against Warden Hirsch is without merit.

Finally, Garrett named the University of Texas Medical Branch as a Defendant in his lawsuit. The University of Texas Medical Branch is an agency of the State of Texas, and so Garrett's claim against UTMB is in effect one against the State of Texas. *See* Ruiz v. Estelle, 679 F.2d 1115, 1137 (5th Cir. 1982) (permitting action for injunctive relief against board members of the Texas Board of Corrections in their official capacity, but denying action against Board itself). A lawsuit against a state agency is barred by the doctrine of sovereign immunity; in such a case, when the State itself is the real party in interest named as Defendant, the lawsuit is barred regardless of whether it seeks damages or injunctive relief. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101-02 (1984); *accord*, Hafer v. Melo, 112 S.Ct. 358, 363 (1991).

In Kentucky v. Graham, 473 U.S. 159 (1985), the Supreme Court stated that while local governmental units could be sued in their own name for damages or equitable relief, a State may not be sued directly in its own name regardless of the relief. Kentucky v. Graham, 473 U.S. at 167 n.14; Amendment XI, *United States Constitution*. Garrett's claim against UTMB was made directly against the state agency itself. This is the same as a lawsuit against the State in its own name, which is barred by the doctrine of sovereign immunity. *See* Alabama v. Pugh, 438 U.S. 781 (1978) (*per curiam*); Delahoussaye v. City of New Iberia, 937 F.2d 144, 146 (5th Cir. 1991). Consequently, Garrett's claim against UTMB must fail.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Garrett's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted in federal court. Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous as to its refiling in federal court. 28 U.S.C. §1915A(b). The Court offers no opinion as to the merits *vel non* of any claims for state-law negligence which Garrett may bring in the courts of the State of Texas, and the dismissal of this federal lawsuit is without prejudice to any such state-law claims, brought in state court, which Garrett may wish to raise. It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **13** day of **April, 2007.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE